**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**



FILED BY ___ D.C.

APR 1 7 2020

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

| | | |
|---|---|---|
| **MAX JERI** | ) | |
| | ) | |
| `Petitioner | ) | |
| | ) | |
| **vs.** | ) | **15-cr-20822** |
| | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent** | ) | |

## EMERGENCY PETITION AND MEMORANDUM IN SUPPORT OF PETITION FOR RELIEF UNDER THE FIRST STEP ACT AND THE CORONAVIRUS RELIEF ACT

COMES NOW, Max Jeri, your Petitioner in the instant case, pro se, who respectfully files for leave to file this Emergency Petition and Memorandum in Support of said Petition for relief, pursuant to Section 404(b) of the First Step Act of 2018 and The Coronavirus Relief Act, and the CARES Act for an order immediately transferring him to home confinement, or reducing his sentence  instanter, and in support thereof, states as follows:

### STATEMENT OF JURISDICTION

This United States District Court for the Southern District of Florida at Miami has jurisdiction over all offenses against the criminal laws of the United States which take place in that district, under 18 U.S.C. Section 3231, 21 U.S.C. Section 41(a)(1)(b)(1)(A), and 21 U.S.C. Section 846.

## PROCEDURAL HISTORY

Petitioner was arrested on October 9, 2015, and charged with Importation of a Controlled Substance and Possession with Intent to Institute a Controlled Substance, and was indicted for the same crimes on October 22, 2015. He was arraigned on October 27, 2015, at which time a standing discovery order was entered.  On October 29, Petitioner was assigned an Assistant Federal Public Defender.

After  jury trial, Petitioner was found guilty of both charges, on March 15, 2016, was sentences to 120 months imprisonment, and four years of supervised release. Petitioner filed an appeal, and his judgment was affirmed on October 6, 2017. Petitioner then filed a writ of certiorari with the United States Supreme Court, but his petition was denied on December 5, 2017.   Petitioner timely filed his initial Petitioner for relief under Section 2255, and timely files this Memorandum of Law in Support of that Petitioner as Ordered by this Honorable Court. That petition still pends before this Honorable Court. Petitioner also currently has a pending Complaint in the U.S. District Court in North Carolina for well-documented violations of his Eighth Amendment rights, which is also pending.   The government has taken several extensions and has yet to file a Response. Petitioner.He now files this Emergency Petitioner for relief, for the reasons stated.

## II. PETITIONER'S  CHRONIC HEALTH ISSUES, GIVEN THE CURRENT HEALTH CRISIS,  PROVIDE AN ADDITIONAL "EXTRAORDINARY AND COMPELLING" REASON FOR   A  RELEASE TO HOME CONFINEMENT.

Petitioner has a well-documented history of chronic medical conditions that put him at extremely high risk of death should he be infected with the Covid-19 virus. Petitioner is a stage-four cancer patient, who previously filed suit against various officials of the Bureau of Prisons for violations of his constitutional rights. Petitioner is acknowledged to be seriously ill, and receives chemo therapy for his stage four cancer at Butner Federal Medical Center., which makes his body more susceptible to infection, and places him within the zone of increased risk of infection, based upon findings of the Center for Disease Control (CDC).

He applied for Compassionate Release in 2019, and incredibly, was denied, even though his life expectancy is less than one year and he has terminal medical condition. See attached denial, as Exhibit I.

According to medical experts, his medical condition puts him at risk of death from the Covid-19 virus sweeping the country and beginning to infect the nation's local, state, and federal prisoners. Petitioner's facility is currently on a modified lock down, and visitors are no longer permitted. However, staff, who is free to move about the general community, interacts on a daily basis with prisoners, including Petitioner.

As the Court well knows, COVID-19 has spread across the globe and throughout the United States. Policymakers at every level of government have recognized the dire risks of COVID-19. On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic. Bill Chappell, Corona virus: COVID-19 is Now Officially a Pandemic, WHO Says, NPR (Mar. 11, 2020), https://tinyurl.com/tpy4v8s.

To mitigate the COVID-19 pandemic, governmental authorities in the United States have issued guidelines and advice for citizens to follow. For example, the CDC's

guidance document recommends the following: - "Work or engage in schooling FROM HOME whenever possible." - "AVOID SOCIAL GATHERINGS in groups of more than 10 people." - "Avoid eating or drinking at bars, restaurants, and food courts." - "AVOID DISCRETIONARY TRAVEL, shopping trips, and social visits." - "DO NOT VISIT nursing homes or retirement or long-term care facilities unless to provide critical assistance." CDC, The President's Corona virus Guidelines For America at 2 (emphasis in original), https://tinyurl.com/v9kngde. III. The Pandemic's Effect on Communal Living Spaces Communal living spaces present especially serious risks related to COVID-19. One highly publicized example is nursing homes. These communities are "at risk because residents live in tight proximity, with staff interacting closely with them." Jon Kamp, Corona virus Outbreaks Spreading in Nursing Homes, The Wall Street Journal (Mar. 19, 2020).

Custodial living spaces, such as prisons and jails, and halfway houses present the same risks. Incarcerated individuals are more vulnerable to contract the disease because they live in cells with multiple people in close quarters, are regularly required or allowed to inhabit communal spaces for eating, bathing, or awaiting transport to or from court, and are nearly always in close contact with other people. The active vulnerability of the prison population in turn compounds the risk to the public health because lawyers, correctional officers, and other staff are coming into and out of the prison and therefore can carry to the outside world any diseases that festered inside. Understanding these concerns, governmental authorities increasingly are attempting to release prisoners affected by COVID-19. See, e.g., Julia Marsh, NYC to begin releasing inmates amid coronavirus outbreak, New York Post (Mar. 18, 2020), https://tinyurl.com/trba737.

Courts around the country are addressing issues relating to incarceration; for example, the extension of self-surrender dates due to COVID-19.

The COVID-19 virus can severely damage lung tissue, which requires an extensive period of rehabilitation, and in some cases, can cause a permanent loss of respiratory capacity. COVID-19 may also target the heart muscle, causing a medical condition called myocarditis, or inflammation of the heart muscle. Myocarditis can affect the heart muscle and electrical system, reducing the heart's ability to pump. This reduction can lead to rapid or abnormal heart rhythms in the short term, and long-term heart failure that limits exercise tolerance and the ability to work. People of all ages and medical backgrounds who have experienced serious cases of COVID-19 describe painful symptoms including vomiting, severe diarrhea, relentless shivering, and suffocating shortness of breath.

Emerging evidence suggests that COVID-19 can also trigger an over-response of the immune system, further damaging tissues in a cytokine release syndrome that can result in widespread damage to other organs, including permanent injury to the kidneys and neurological injury.

These complications can manifest at an alarming pace. Individuals can show the first symptoms of COVID-19 infection in as little as two days after exposure, and their condition can seriously deteriorate in as little as five days or sooner. People can also spread COVID-19 but be asymptomatic. Most people who develop serious disease will need advanced support. This level of supportive care requires highly specialized equipment that is in limited supply, and an entire team of care providers, including 1:1 or 1:2 nurse to patient ratios, respiratory therapists, and intensive care physicians. This level

of support can quickly exceed local health care resources. This level of medical support does not exist in the federal Bureau of Prisons and certainly not at Petitioner's institution.

The need for care, including intensive care, and the likelihood of death, is much higher from COVID-19 infection than from influenza. According to recent estimates, the fatality rate of people infected with COVID-19 is about ten times higher than a severe seasonal influenza, even in advanced countries with highly effective health care systems. For people in the highest risk populations, the fatality rate of COVID-19 infection is about 15 percent—ten times the average rate. Preliminary data from China showed that 20 percent of people in high-risk categories who have contracted COVID-19 there have died. People who experience serious cases of COVID-19 who do not die from COVID-19 should expect a prolonged recovery, including the need for extensive rehabilitation for profound reconditioning, loss of digits, neurological damage, and the loss of respiratory capacity.

There is no vaccine against COVID-19, nor is there any known medication to prevent or treat infection. The only known effective measures to reduce the risk for vulnerable people from injury or death from COVID-19 are to prevent them from being infected in the first place, and to limit community spread. Social distancing or remaining physically separated from known or potentially infected individuals, and vigilant sanitation and hygiene, including repeatedly and thoroughly washing hands with soap and water, are the only known effective measures for protecting vulnerable people from COVID-19. Petitioner has no access to the types of sanitary and germ killing materials needed to protect herself from this disease. There are numerous reports of prisoners and

prison staff becoming infected and falling ill. Given Petitioner's age and risk factors, it is highly likely that if he is infected, the results could be life-threatening.

Under these circumstances, it would be highly prudent to have Petitioner transfer directly to home confinement, and complete his sentence away from the crowded atmosphere of the prison, to avoid exposure to the spreading life-threatening virus which is now ravaging the country.

### III. THE ATTORNEY GENERAL, THE BUREAU OF PRISONS, AND THE COURTS ARE EMPOWERED UNDER THE CORONAVIRUS RELIEF ACT TO TRANSFER PETITIONER TO HOME CONFINEMENT

Under this legislation, if the Attorney General "finds that emergency conditions will materially affect the functioning of the Bureau, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a person in home confinement under the first sentence of section 3624(c)(2) of Title 18, U.S.C., as the Director determines appropriate."   Attorney General Barr also issued a memo  that encouraged the Bureau of Prisons to "expand home confinement, particularly for those older prisoners who have served substantial parts of their sentences and no longer post a threat and may have underlying conditions that make them particularly vulnerable," to slow the spread of the infection. It is clear that        Petitioner, who has a wife and extended family in the jurisdiction of the court,  would clearly be much safer at home than in prison..

## IV. FEDERAL JUDGES CAN REDUCE SENTENCES FOR PEOPLE WHOSE CASES PRESENT "EXTRAORDINARY OR COMPELLING REASONS" UNDER THE COMPASSIONATE RELEASE STATUTE IN 18 U.S.C. § 3582(C)(1)(A)(I).

Under current law, federal judges have been limited in the ways that they can consider and reduce a sentence once a final judgment is imposed. One way that judges can modify a sentence is through the compassionate release statute under 18 U.S.C. § 3582(c), which is often used to resentence someone who is terminally ill. But with the changes made to the compassionate release statute by on the actor's knowledge of the sanctions themselves and an ability to weigh not only the severity of the sanction with which he or she will be met, but also the likelihood of being met with that sanction.").

The recently enacted First Step Act, courts can also use the compassionate release statute as a second look provision in cases that present "extraordinary and compelling reasons."

A. The history of second look compassionate release and its expanding development. The compassionate release statute was originally enacted as part of the Parole Reorganization Act of 1976.76 Codified at 18 U.S.C. § 4205(g), it read as follows: At any time upon motion of the Bureau of Prisons, the court may reduce any minimum term to the time the defendant has served. The court shall have jurisdiction to act upon the application at any time and no hearing shall be required. Importantly, the Section 4205(g) remedy of a sentence reduction was not limited in scope to mere medical issues.

In <u>United States v. Diaco</u>, a district court reduced a sentence upon motion of the BOP and U.S. Attorney. The court noted that Diaco had been "a model prisoner," and the court reduced his five-year sentence based on sentencing disparities between Diaco and

his more culpable co-defendants, who had only served six months imprisonment.78 In United States v. Banks, the BOP Director had filed a motion for a sentence reduction, arguing that Banks, who was serving time for armed robbery, had "outstanding institutional adjustment," and "[h]is conduct record is clear and his work uniformly competent.

The district court granted the motion in the face of the U.S. Attorney's office that argued against the BOP recommendation "because of the serious nature of Mr. Banks' offense."80 In sum, Section 4205(g) was used to correct and reduce long sentences where a person in prison showed a demonstrated record of rehabilitation, and this was the compassionate release statute Congress was familiar with when it enacted the modern compassionate release statute. Congress enacted the modern form of the compassionate release statute contained in 18 U.S.C. § 3582 as part of the Comprehensive Crime Control Act of 1984. Section 3582(c) states that a district court can modify even a final "term of imprisonment" in four situations, the broadest of which is directly relevant here. A sentencing court can reduce a sentence if and whenever "extraordinary and compelling reasons warrant such a reduction."

Congress never defined what constitutes an "extraordinary and compelling reason" for resentencing under Section 3582(c).82 But the legislative history gives an indication of how Congress thought the statute should be employed by federal courts. One of Congress's initial goals in passing the Comprehensive Crime Control Act was to abolish federal parole and create a "completely restructured guidelines sentencing system."

Yet, recognizing that parole historically played a key role in responding to changed circumstances, the Senate Committee stressed how some individual cases may still warrant a second look at resentencing: The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defender was convicted have been later amended to provide a shorter term of imprisonment.[84] Rather than having the Parole Commission review every federal sentence focused only on an offender's rehabilitation, Congress decided that § 3582(c) could and would enable courts to decide, in individual cases, if "there is a justification for reducing a term of imprisonment."

Congress intended for Section 3582(c) to act as "safety valves for modification of sentences,"[86] enabling sentence reductions when justified by various factors that previously could be addressed through the (now abolished) parole system. The safety valve would "assure the availability of specific review and reduction to a term of imprisonment for 'extraordinary and compelling reasons' and [would allow courts] to respond to changes in the guidelines."

Noting that this approach would keep "the sentencing power in the judiciary where it belongs," rather than with a federal parole board, the statute permitted "later review of sentences in particularly compelling situations." Congress thus intended to give federal sentencing courts an equitable power that, unlike parole, would be employed on an individualized basis to correct fundamentally unfair sentences. And there is no

indication that Congress limited the compassionate release safety valve to medical or elderly.

There is nothing unusual about Congress legislating a broad and open standard and then delegating that particularized application of that standard to an executive agency or the federal judiciary. Congress has, for example, delegated to the judiciary to define what constitutes a "reasonable attorney's fee" under the various civil rights statutes. U.S.C. § 2000a-3(b); see also Frank H. Easterbrook, Statutes' Domains, 50 U. CHI. L. REV. 533, 544 (1983) ("The statute books are full of laws, of which the Sherman Act is a good example, that effectively authorize courts to create new lines of common law.").

The U.S. Sentencing Commission has also concluded that Section 3582(c)(1)(A)'s "extraordinary and compelling reasons" for compassionate release are not limited to medical, elderly, or family circumstances. Congress initially delegated the responsibility for determining what constitutes "extraordinary and compelling reasons" to the Commission. Congress provided only one limitation to that delegation of authority: "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." Congress no doubt limited the ability of rehabilitation alone to constitute extraordinary circumstances, so that sentencing courts could not use it as a full and direct substitute for the abolished parole system. Congress, however, contemplated that rehabilitation could be considered with other extraordinary and compelling reasons sufficient to resentence people in individual cases. Indeed, the use of the modifier "alone" signifies just the opposite: that rehabilitation could be used in tandem with other factors to justify a reduction. The Commission initially neglected its duty, leaving the BOP to fill

the void and create the standards for extraordinary and compelling reasons warranting resentencing.

The Commission finally acted in 2007, promulgating a policy that extraordinary and compelling reasons includes medical conditions, age, family circumstances, and "other reasons." After a negative DOJ Inspector General report9found that the BOP had rarely moved courts for compassionate release even under their own policies, the Commission amended its policy to encourage the BOP to file motions for compassionate release more often.95 The Commission created several categories of qualifying reasons: (A) "Medical Conditions of the Defendant," including terminal illness and other serious conditions and impairments; (B) "Age of the Defendant," for those 65 and older with serious deterioration related to aging who have completed at least 10 years or 75 percent of the term of imprisonment; (C) "Family Circumstances," where a child's caregiver or spouse dies or becomes incapacitated without an alternative caregiver; and (D) "Other Reasons," when the Director of the BOP determines there is "an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) 89 S. Rep No. 98-225, supra note __, at 55–56. 90 See 28 U.S.C. § 994(t) ("The Commission . . . shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."). 28 U.S.C. § 994(t) (emphasis added).

The  BOP created policies governing compassionate release. The latest version prior to passage of the First Step Act was Program Statement 5050.49, Compassionate Release/Reduction in Sentences (Mar. 25, 2015). 93 U.S.S.G. § 1B1.13, Application Note 1(A). 94 See U.S. Dep't of Justice Office of the Inspector General, The Federal Bureau of

Prisons' Compassionate Release Program (Apr. 2013). 95 Id. at Application Note 4; see also <u>United States v. Dimasi</u>, 220 F. Supp. 3d 173, 175 (D. Mass. 2016) (discussing the progression from the OIG report to new "encouraging" guidelines). 16 through (C)." The Commission also clarified that the extraordinary and compelling reasons "need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment."

So even if an "extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court, [that fact] does not preclude consideration for a [sentence] reduction." Consistent with the text and legislative history of § 3582(c), the Commission concluded that reasons beyond medical, age, and family circumstances could qualify as "extraordinary or compelling reasons" for resentencing, and that the extraordinary or compelling reasons need not be based on changed circumstances occurring after the initial sentencing of the defendant

Federal judges now have the power to order reductions of sentences even in the face of BOP resistance or delay in the processing of applications. The legislative history leading up to the enactment of the First Step Act establishes that Congress intended the judiciary not only to take on the role that BOP once held under the First Step Act compassionate release statute as the essential adjudicator of compassionate release requests, but also to grant sentence reductions on the full array of grounds reasonably encompassed by the "extraordinary and compelling" standard set forth in the applicable statute.

Petitioner has accumulated an excellent institutional record, which argues strongly in favor of his release to home confinement.   He has undertaken to rehabilitate himself,

to the best of his limited physical ability.  He has a release address on file with the BOP, and has the support of his large, loving, extended family.

## CONCLUSION

As previously set forth, Petitioner is entitled to relief, and  Defendant/Petitioner respectfully moves this Honorable Court grant this Petition to grant Compassionate Release and/or immediate release to home confinement , based upon "Extraordinary and compelling" reasons, as set forth herein, appoint counsel to represent Petitioner in subsequent proceedings, and all other relief that this Honorable Court deems just.

Respectfully Submitted,

By: _Max Jeri_____

## CERTIFICATE OF SERVICE

I,  Petitioner, do hereby certify that a true and correct copy of this Reply was duly caused to be served on all parties entitled to notice via the Prison Mailbox Rule on  the  _15th_ day of _April_  , 2020,  via First Class Mail.

Signed: _Max Jeri_____



**U. S. Department of Justice**

Federal Bureau of Prisons

Federal Correctional Complex

_Federal Medical Center_
_P. O. Box 1600_
_Butner, NC 27509_

November 21, 2019

JERI, MAX
Reg. No.: 06428-104
Quarters: D04-432L

Dear Mr. Jeri

Medical staff reviewed your request for a Reduction in Sentence (RIS) to determine whether you met the RIS guidelines in accordance with Program Statement 5050.50. It has been determined that you **do not** meet the criteria under **Terminal or Elderly with Medical Conditions** at this time.

You have the right to appeal this decision via the Administrative Remedy Process. If you choose to appeal, you do not need to complete the informal review, but you would need to include a copy of this memorandum with your appeal. Any decision regarding appeal will be handled in a manner outlined in policy. Additionally, per policy you have a right to file a request for a reduction in sentence with your sentencing court after receiving a BP-11 response or the lapse of 30 days from the receipt of such a request by the Warden's Office.

We are committed to providing you with the necessary and appropriate care for your medical needs.

Sincerely,

T. Scarantino
Complex Warden

cc: AW
Medical Records
Unit Team

PRESS FIRMLY TO SEAL                    PRESS FIRMLY TO SEAL



U.S. POSTAGE PAID
PM
LINCOLNSHIRE, IL
APR 18, 20
AMOUNT
**$26.35**
R2304N117055-05

1007          33129

# PRIORITY
★ MAIL ★
EXPRESS™

OUR FASTEST SERVICE IN THE U.S.


**UNITED STATES POSTAL SERVICE®**

**PRIORITY MAIL EXPRESS®**

EJ 203 846 254 US

WHEN USED INTERNATIONALLY
A CUSTOMS DECLARATION
LABEL MAY BE REQUIRED.





EP13F July 2013   OD: 12.5 x 9.5

PS10001000006

**VISIT US AT USPS.COM®**
ORDER FREE SUPPLIES ONLINE


**UNITED STATES POSTAL SERVICE**

CUSTOMER USE ONLY

FROM: (PLEASE PRINT)   PHONE (     )

Max Jeri
06428-104
PO BX 1600
Butner, NC 27509

**DELIVERY OPTIONS (Customer Use Only)**
☐ SIGNATURE REQUIRED
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available)
☐ 10:30 AM Delivery Required (additional fee, where available)

TO: (PLEASE PRINT)   PHONE (     )

USDC-SD-FL (Miami
400 N. Miami Ave
Miami, FL
33128

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 insurance included.

PEEL FROM THIS CORNER

destinations. See DMM and IMM at pe.usps.com for complete details.
‡ Money Back Guarantee for U.S. destinations only.

**PAYMENT BY ACCOUNT (if applicable)**

| PO ZIP Code | Scheduled Delivery Date | Postage |
|---|---|---|
| 60069 | 4/17/20 | $ 26 35 |
| Date Accepted | Scheduled Delivery Time | Insurance Fee |
| 4/16/20 | ☐ 10:30 AM ☒ 3:00 PM | |
| Time Accepted | 10:30 AM Delivery Fee | Return Receipt Fee |
| 4:54 ☒ AM ☐ PM | | |
| Weight | ☐ Flat Rate | Total Postage & Fees |
| | Acceptance Employee Initials E.C | $ 26 35 |

DELIVERY (POSTAL SERVICE USE ONLY)

LABEL 11-B, MARCH 2016

⁂ This envelope is made from post-consumer waste. Please recycle again.